Good afternoon, Illinois Public Court, 1st District Court is now in session, the 6th division, the Honorable Justice Carl A. Walker presiding, case number 25-1219, Safe Zone Services v. Linn-Mathes, Inc. And good afternoon, everybody. I am Justice Carl Walker. I also have here with me Justice Roy Pachinski and Justice Michael Hyman. And I would like to have the attorneys who will be arguing to start by introducing yourselves. Let's start with the appellant. Good afternoon, Your Honor. Christopher Kelleher for the Plaintiff Appellant, Safe Zone Services. Thank you, Mr. Kelleher. And let's go to those who will be arguing for the appellees. I think there will be 2 people arguing. Is that correct? I think we authorized that, I thought. I thought it was more, Your Honor. I apologize. Oh, okay. I think we authorized 2. How many do you have that's going to be arguing? Everybody? Sounds like we all have different parties and different interests. Apologize. Now, I think we gave you a total of 25 minutes though, right? Correct, Your Honor. For all 4 of you. So you're going to divide that up with 6.14 minutes each. Is that how you're going to do it? I believe it's going to be 10 for myself, 5 for Mr. Higgins, 5 for Mr. Weber, and 5 for Mr. Ibaki. Okay. And so, Mr. Jacobson, go ahead and introduce yourself. Let's start there. I apologize for not doing proof, so, Your Honor. Attorney Mark Jacobson, appearing for the appellees, Raimundo Rivera and JLL Construction Services, Inc., or LLC, I believe. Okay. Your Honor, Sean Higgins, appearing for the appellee, Lynn Mathis, Inc. Okay. Good morning, Your Honors. Ben Weber on behalf of appellee Roosevelt Western Currency Exchange, Inc. Good afternoon, Your Honors. Attorney Dominic Herbacci on behalf of defendant appellee Belmont Bank. And so, 5 minutes, 5 minutes, 5 minutes, and 10 minutes for Mr. Jacobson, correct? Correct, Your Honor. We will allow that. We did authorize that prior to today, and we will stick with that. So, we're going to go ahead and let you get started. I will say that we do know the facts of the case. We always read everything, and I want you all to know that we are always open-minded. We don't allow our questions to make you feel that we're leaning one way or the other. We will ask questions that may be some tough questions, but it's not because we're leaning one way or the other. It's because we want to get it right. So, just know that about all the justices. So, with that, we're going to – oh, by the way, rebuttal time. Mr. Jacobson, did you want to do a rebuttal? No. Mr. Kelleher. No, it would be – well, who would it be? Who wanted to save time for a rebuttal? You have 10 minutes. Everybody says 5. Do you want to save a minute for a rebuttal? And Mr. Jacobson, I think you have 10, right? Correct, Your Honor. And do you want to save anything for a rebuttal? Just a second, Justice Hyman. Did you want to save anything for a rebuttal? Yes, if I could reserve one minute, Your Honor. Yeah, you can reserve one minute for a rebuttal. Thank you, Your Honor. Is there the appellee? No, I'm – oh, no. The appellee, Your Honor. Oh, I'm sorry. Yes, you are. No, Mr. Kelleher it is. Yes, I'm the appellee. Mr. Kelleher, you're the appellate. Yes, Your Honor. Okay. I'm sorry. You're correct, Justice Hyman. Mr. Kelleher, are you saving anything for a rebuttal? I apologize. Yes, no problem. I didn't want to interrupt. If I can have four minutes for a rebuttal, Your Honor. Okay, four minutes. Okay. All right. You can have that. Okay. So, Mr. Kelleher, you can go ahead and get us started. Thank you, Justice Walker. Good afternoon. Christopher Kelleher for Plaintiff Appellant Safe Zone Services. With four different defendants, six appellate briefs, and a slew of motions, I recognize there is much to digest with this appeal. I will try to distill this case to its essentials. And this isn't necessarily difficult because I believe this case can be summed up in a sentence. Safe Zone did over $200,000 worth of work but never received compensation. Now, the why is admittedly a bit more nuanced. But even here, I believe the issue can be summed up succinctly. Defendant Rivera furloughed the funds and the remaining defendants accommodated that theft. So, with those two simple factual premises underlying this suit, we respectfully assert the drastic remedy of summary judgment was improper. We assert five factors facilitate reversal. The first two concern the lens through which this court views this appeal. And that, of course, for summary judgment is de novo. Thus, the facts are construed in Safe Zone. Now, Mr. Kelleher, just really quickly, though. There was an email that your client sent saying that he was questioning, I think it was in February, questioning why he would even be receiving these checks and that they should go directly to JLL. How does that relate to your argument right now about this, what you're claiming? Your Honor, the emails, I will admit, are a bit confusing. As I sit here now, I'm still confused by them because there's different messages being sent. There's mixed messages from Mr. Avery from Safe Zone. But there's also, given the context of what was happening, Mr. Avery was very, very frustrated. And he had repeatedly asked Lynn Mathis to provide the checks to him. And essentially, he was being ignored. And so I believe that the email in particular, Your Honor, is talking about, that was sent more out of frustration than anything else. Additionally, to add further confusion to the issue, the project was still ongoing with JLL. Now, by that time, by February, Safe Zone had extricated itself from the project. But JLL was still involved, and there were still payments that had to be made going back for work that was done in the fall, as well as work that was continuing to be done. So the emails from Mr. Avery where he's asserting that payment should be made to JLL can be read in a couple ways. One, again, as I said, he was frustrated with what was going on. He recognized that Safe Zone was not being paid for its work. And then additionally, there was work and payment that should go to JLL. And that was the future, I believe it was approximately $165,000 that was still left on the contract. So there's kind of two underlying points to those emails where he's saying JLL should be paid. Along those lines as well as a corollary to that point, these emails show that there are issues of fact here. What exactly was Mr. Avery intending when he said JLL should be paid? And I recognize a plaintiff can't create issues of fact on their own. But again, given all the emails, the flurry of emails going back and forth between Mr. Avery and Mr. Rivera, as well as between Mr. Avery and Lynn Mathis, it shows that there was not any sort of meaning in the minds. There was confusion. And these are the exact sort of knotty fact-laden questions that we shouldn't resolve here. It should be resolved in front of a jury. And additionally- What is the strongest disputed fact that should have prevented the summary judgment here? There's a few, but if I had to pick one, I would definitely say the confession, as I call it, of Mr. Rivera, that he would be prosecuted for essentially, again, and I don't use this word lightly, but essentially stealing these funds. These funds, he knew, were not meant for him. They were work that was done by SafeZone in September, in October, and therefore was SafeZone. So I would say that that email where, again, Mr. Rivera discredited concedes that he was in the wrong and he would be prosecuted potentially criminally for taking this money. Would one of the issues have to be with the MIPA? Yes, Your Honor, as well. The MIPA, as well as that assignment, as we call it, which was appended, those two documents, to point out, they were drafted by Mr. Rivera's counsel, number one. Number two, they specifically state that Mr. Rivera was waiving all rights to future funds, again, for work that was done by SafeZone. And to be clear, and I- But wasn't there- Go ahead, Justice Simon, you can go ahead. Where is that stated? In paragraph- that would be in assignment- Well, I'll point to the MIPA, paragraph 10, that's in the indemnification, and that says that Rivera would indemnify SafeZone for, quote, all losses, damages, costs, and expenses resulting from these projects, including the EMIC project. That has nothing to do with the past payments. That doesn't say anything about past payments. Well, Your Honor, I would say- I asked you, where is it? You said that there's something in the MIPA that has to do with past payments. Well, I would say that the indemnification in paragraph 10, and then- That's what you're talking about, A? Yes, paragraph 10. And then for the assignment, if I can also point to the assignment, that would be paragraphs 1 and 2, where, again, Mr. Rivera acknowledges that any amounts that he was entitled to have already been received. And, again, that's paragraph 2 of the assignment. And then, of course, in paragraph 1, the assignment says, all future distributions and payments for SafeZone are to be paid to Avery. So the assignment is very clear, as well as the MIPA. But I will again concede that could things have been clearer? Could Mr. Rivera's counsel have drafted things clearer? Yes. Well, if it was so clear, we wouldn't be here years later. Well, that's true. That's true. But, again, the contractual intent, that's an issue, as we pointed out. We cited cases. Those are- You only go to intent if there's an ambiguity, right? Certainly. So you're saying the contract's ambiguous? And I'm not trying to have it both ways. Yes and no, and if I can explain very quickly. The short answer would be no. I don't think that either the MIPA or the assignment are ambiguous. However, could it have explicitly stated that the pre-MIPA receivables should go directly to SafeZone? Yes. So, in essence, it could have been clearer. But at its core, I would say no, neither are ambiguous. They just simply don't explicitly say what happens to the pre-MIPA receivables. Then why don't you lose? This is a very easy case, Coordinator Judge. The SafeZone services will have no interest or involvement with any of these contracts, period. We're done. That's what the judge said. Well, Your Honor- I mean, do you agree with the judge? No, I don't. But, in a sense, that reading is correct going forward. And that was, again, and this is- Well, again, isn't there ambiguity? You say no. But, again, you say I can't have it both ways. But if that isn't ambiguous, the judge didn't see it ambiguous at all. That's correct. But, again, I would point to Paragraph 2 of the assignment in which Rivera acknowledges that all amounts have already been received that he's entitled to. And then in Paragraph 1, again, it directs all future payments for SafeZone to be paid. Well, were they accrued, though, prior to that agreement? Yes, Your Honor. That was for work that was done in September, October, and November. Sorry, go ahead. Right. So, any work that-anything that had already been accrued, he would clearly be entitled to. But I guess my question is that SafeZone waived and relinquished all of its rights, titles, and interests in those certain construction projects, specifically being those listed in Exhibit A, being the Emmett project. So I'm trying to reconcile that with why he would not be entitled to funds related to that project. I understand, Your Honor. And, again, I think part of the problem is, is that the project was ongoing. Things were in a state of flux. Obviously, you know, major-as this was a major construction project, it's not as simple as, you know, getting into a taxi and paying a taxi driver and you're done. This is ongoing work. You know, the payments aren't made for months after. And so for the work, again, once the MIPA- So work done prior to the agreement, probably, arguably, you could say that that money belongs to SafeZone. But once the agreement is in place, at that point, it seems to me that then any funds would now belong to Rivera. Precisely. In that the funds, once, and this is kind of we're splitting hairs here. For the work that was done prior in September and October, obviously, it wasn't paid at that time. It wasn't paid until, obviously, January and February. But that revenue should be paid or those checks should be paid because it was work from September, October. SafeZone was not trying to have it both ways and say, yeah, we get everything for work done later that we're not involved with. Mr. Avery was very clear and specified in emails that for the $165,000 that was left remaining, that was JLL's money. That wasn't SafeZone. And that's where, and again, Mr. Avery could have been a little bit clearer, I think, in some of his emails by just saying, look, we're out of this project. We don't want the money for future work, but we want it for the work that we did in the past. What was the benefit to Rivera in giving up his 49% interest in SafeZone? I think it was more, frankly, I think it was a benefit for Mr. Avery because he, essentially, the two of them, I don't think the partnership wasn't working, I think for either party. I don't think Mr. Avery was happy with Mr. Rivera and vice versa. So I think for both of them, I think as some of the defendants note in the email that they were trying to make a clean break, it just wasn't working. And so I think Mr. Rivera would benefit along with JLL because they would then get the work that SafeZone had been doing. So essentially they were going to step in to SafeZone. Which included the Emmett project, correct? Correct. And those are what the checks were for, right? Yes. Okay, so then what makes it, what creates the problem with him having received those checks? What's the problem that we're missing? Well, a few points. Firstly, those checks, again, they were issued in January and February, but they go back, and there's no dispute about this, they go back for work that was done in September, October, November. So both checks go back to that period prior to the November 9th date or November 6th date? Yes, that is correct. That is correct. And so that's obviously, that's been the catalyst for this suit. I mean, Mr. Avery and SafeZone have been very frustrated that they did this work, and again, it was a lot of work, it was $200,000 worth of work, and the checks, and Lynn Mathis, the subcontractor, excuse me, the general contractor, knew that these payments were supposed to go to SafeZone. And they wrote the first check, the January check, was written to  So it wasn't like they thought it should go to JLL, there was confusion. They knew, and Mr. Avery was very clear in his initial emails in December that these payments are supposed to go to him. It's supposed to go to the SafeZone PO box. And so Lynn Mathis, to claim that, well, we weren't sure or we didn't understand, we respectfully disagree with that because, again, they knew that Rivera was not, he was not supposed to get these checks, and that's why they made at least the first check out to SafeZone. Obviously, the second February check, they made out jointly to SafeZone and JLL, but even the second check, both checks had SafeZone on them. So there was no dispute as to who should get this money. If I understand your argument, then, what you are saying is that there is no ambiguity in the MIPA, but you can't read the MIPA without looking at the assignment, and that your argument, tell me if I'm right or wrong, is that the assignment answers the questions before the court. The question before us is, who's entitled to the payments for the work that was completed? Those two checks, you say, uncontested, were for work performed before the closing. Therefore, does those checks go to Rivera or do they go to SafeZone? That's the whole case. Am I right? That is correct, John. Okay. So if I'm right on that, and then your argument is the assignment answers that question, and that's it. If you only look at the one and not the other, you're going to get the wrong answer, and the judge didn't take account of the assignment, which would have clarified who was entitled to those funds for that work that had been completed. Is that your argument? Yes, it is, Your Honor. Okay. Yes. And, again, the assignment, that was obviously appended. It was referenced in the MIPA, so there's no question that that was part and parcel of the MIPA. And going back to your prior earlier question, again, could things have been a little bit clearer? I mean, I guess that's every contract out there. There's always something that could be clearer in hindsight. But, yes, Your Honor, that is our position. And having gone through the massive briefs and documents, am I to understand that as far as the other two projects are concerned, there was no issue with regard to payments, apparently? The only issues on the payments, apparently, had to do with EMIT. Is that correct? That is correct. That is correct. There are the issue of the open invoices. But, yeah, but as far as- Yeah, I understand open invoices and the union stuff and everything else.  Right. Right. Did you have anything further, Mr. Kelleher? You can continue arguing. You've got no time. Briefly, Your Honor, I would point out, and as we noted in our motion to the court, we did file one motion, we've had a problem with discerning whether counsel for JLL is actually representing JLL. Again, unfortunately, Mr. Lewis, the owner of JLL, passed away in March during the pendency of this appeal. And even that development, prior to that development, we had argued in our briefs and even in the circuit court that there was no evidence that Mr. Lewis had authorized Mr. Jacobson's representation. So the argument was that Mr. Rivera had retained Mr. Jacobson, but as we note, Mr. Rivera was never an owner, never a manager, never a shareholder of JLL. He was essentially just an employee. And we assert, based on that fact, he had no authority to retain Mr. Jacobson for the JLL Corporation. And again, this is important- The individual who passed away filed an appearance for the entity, JP? Is that what you said? Mr. Lewis, he, no. And he essentially wanted nothing to do with Mr. Jacobson. No, I'm not asking, that's not my question. Oh, I'm sorry. When he was alive, who was representing him, that entity? Mr. Jacobson. Mr. Jacobson? Yeah. When he was alive, Mr. Jacobson was representing him? Yes, yes. And then he passed away? Yes. So why wouldn't Mr. Jacobson still represent him? Well, because Mr. Jacobson, excuse me, Mr. Lewis never wanted Mr. Jacobson- But apparently he did, because what you're saying is, if I understand you correctly, Mr. Jacobson was representing Mr. Lewis before he died. Well, the real question is, is that in the record that he never wanted him? I mean, was there a statement from him as to that? Yes, there is, Your Honor. Yeah, there is, and I can dig that out. But essentially, Mr. Jacobson, excuse me, Mr. Lewis had said he doesn't want to talk to Mr. Jacobson, this attorney, and he said any further, he would sue Mr. Jacobson for harassment if he continued to ask Mr. Lewis about this case. So Mr. Lewis essentially is the way I read it, and this is not in there, but- What did you say, not in there, in where? Well, in the record. We don't want to hear it. If it's not in the record, don't tell us. Okay, well, no, and I understand that. I'm just saying that there's a conflict of interest between Mr. Rivera and Mr. Lewis because- Well, nobody's brought it up. I mean, if Mr. Lewis passes away, that's an individual. The entity continues, and that was represented by Mr. Jacobson. So I'm kind of at a loss for where this is. Well, again, that Mr. Lewis, and I should say JLL more specifically than Mr. Lewis, but JLL essentially didn't answer discovery, and Mr. Jacobson and Mr. Lewis basically didn't pursue this case or defend this case, and so they've essentially had it both ways by Mr. Lewis and JLL not responding to anything, yet they're still being represented. So I would rest on the briefs on that point. But regardless, even if the court disagrees with our position, JLL's brief essentially is a concession. They've ignored Mr. Rivera's forgeries, his scheme of representing himself as safe zone vice president, his admission to falsely operating a safe zone on the MN project after the MIPO was signed, and of course his confession. So the silence on these very, very salient and very dispositive points represents a complete concession. And just really quickly, we know that, I think Avery retained the right to receive payments for work performed on the MN project. My question really is how does that reconcile with the position that the statement that Avery would have no interest or involvement in the contract? Yes, Your Honor. That was going forward. So that was essentially, again, as we previously said, the parties were trying to make a clean break. And so therefore, Mr. Avery, because of, again, his disagreements with Mr. Rivera, basically didn't want anything else to do with Mr. Rivera or this project. So he wanted to make a clean break. Again, going forward, he wanted nothing to do with the MN project. And again, any money that JLL and Rivera earned, that was them. He was not trying to step on anyone's toes. But that seems to be the issue right now. And I realize you're claiming that that was already accrued prior to that time, but that seems to be issue right now is that he does want the money. Well, he wants the money for the work he did. And that's, again, that's kind of the, where the disagreement lies. If that's the case, it would seem that the 49% interest in the company at the time that that money was earned, he still had that 49% interest in the company. So it seems that some portion of that money may belong to him anyway, right? True, but I would point to paragraph two of the assignment in which Mr. Rivera acknowledges that anything he was entitled to he's already received and he therefore waives any rights and claims. Well, looking at that agreement though, Avery also says that it wants nothing to do with the project or anything else. So, I mean, I'm just, I'm not sure that it's all really, really clear. So clarify for us if you can. No, Justice Walker, I agree with you again, and I'm not trying to have it both ways, but by saying it's not ambiguous, but it is ambiguous. But I agree that things could have been clearer here and there are some things that are contradictory in a sense, but I guess what they were trying to do was again, make a clean break. And again, the money that Safe Zone had done, or excuse me, the work Safe Zone had done, they were entitled to payment for that work. And then after November, work done after November 6th, the date of the MIPA and assignment, that work would be, any money earned from that work was Rivera and JLL's. So that's really what it boils down to. Thank you, Mr. Keller. You're actually out of time now. So I'm going to move on to Mr. Jacobson. Thank you, honors. Yeah, thank you. Good afternoon to the court. The appellant, as noted, has filed this lawsuit against all entities who were involved in the creation, handling and processing two checks. That means specifically coming from the Emmett Project. This includes everyone from the issuer of the check. We know all that. We know all that. Let me ask you. So Mr. Avery paid $100. And he gave Mr. Rivera over $200,000. That's your position, right? Not completely. What do you mean? Okay, so it is your position, but not completely.  So tell me what's not complete because he paid $100 and he gave up $200,000. What a deal. What a deal. And he didn't even do the work, Mr. Rivera, right? It was all work done. It's uncontested, right? Am I right? Uncontested. It was safe zone work. Is that correct? It was safe zone work, your honor. So he gave up $200,000 under your theory for a $100 payment. Now tell me how that's possible. Because of the fact that this is a divorce between the parties. This is a divorce that was given fulfillment and body and messaging via the MIPA. Specifically within the MIPA, I'm going to cite to page C-195 of volume one. It identifies the three retained projects. Those three retained projects are the MS3. We know what they are. We know what they are. But here's the key part. That's been basically not has been included within the argumentation so far. It specifically says the price of four adjustment. This dollar amount is $388,505. That is the exact dollar amount that is specified within volume one C-169. That is the subcontractor agreement between Lynn Mathis and Safe Zone Services at the time. It specifically identifies exactly what the value of that particular project is. All the projects are actually identified. The only reason why I would disagree with the court's assessment of saying it's $100 and you got $200,000. What a deal. That would be a heck of a deal. I'm not going to use any kind of foul language or anything else, but it would be a heck of a deal. We all know what word I want to use. But it would be this. For the purposes of being able to allow for a complete divorce as specified within the actual terms itself, it allows for the divorce such that 49% that would have been Mr. Rivera's is now Avery's. Free and clear. Safe Zone is his. 100% lock, stock, barrel. Everything else makes it so that he can have that completely. As identified by the court, there are multiple provisions within the MIPA. All of them we can address individually, but I'll bring it right over to the point. It says under paragraph nine, there were particular provisions and requirements, invoices and everything else. To be very blunt, if the Mr. Avery and safe zone intended for those particular invoices or any other work to be retained by safe zone, they would have been included. They are not. I'm not going to say that there is ambiguity such that there's a material issue within the MIPA. The MIPA states what it states. But the argument you just heard, we just heard an argument that he's not arguing in the MIPA. What he's arguing is the assignment. And if you can't look at one without the other. So you're talking about something that he just did not argue. He said, yeah, if you look at the MIPA, it might look. Kind of suspicious, but then you look at what the assignment says. And he says that clarifies. That there was a money owed before. And that safety zone had no. Relationship whatsoever with anything after November six. So any invoices that had any work that accrued before that time. Under the assignment belongs to. Safety zone. That's his argument. Understood your honor. If we're looking at exhibit C one 98. Volume one, that would be the assignment. Those items. That's sitting before me. I haven't. Okay. Just making sure. So that way I have it for the record. Apologize. Those documents are signed at the same time. Concurrent. That also reinforces the concept and the idea, which is being presented here. And that is a divorce. Is to say, but you're not answering my question. My question is. That's even better. It seems to me that helps the argument of safety zone because at the same time. There was this agreement. That said, as it's interpreted. By council for safety zone. That. This provided that any do. Anything do in owing at the time of the closing. Belonged to safety zone. And that Rivera gave up any rights to that. Those, those, those invoices. Respectfully have to disagree because it actually says directs that all projects that are retained. Are retained within the scope of safe zone. I E that anything going forward. Anything after that fact. Anything, any projects or anything else that would be allowed. If that was the case, you were reading it together at the exact same time. The retained projects. Indicates that Emmett project is one that goes with Rivera. It is not a project that retains within safe zone. Mr. Jacobson, are you. Mr. Jacobson. Are you right now telling us though, that the parties did provide a distinction between the future payments and the past payments and the agreement. Cause I'm not sure that that's clear on the agreement. It is that again. Were you the one, by the way, you're the one that drafted the agreement. Correct. No, or was that a different lawyer? Different lawyer. Different lawyer. Okay. All right. All right.   All right. Thank you. Paragraph 10. It allows for the indemnification such that it would be for the separation. And basically it allows for the complete. Separation to different types of projects for each one of the different entities that was signed in a particular agreement. It is not a situation where it is saying, well, We're giving wiggle room. Or anything like that. It's literally saying. And the project is one for Rivera. Rivera indemnifies and protects Avery and safe zone against any particular claims that might arise. It is not. It allows for the complete divorce. That is literally the underlying issue here. Is that this. Even in the complete divorce. As Mr. Kelleher argued earlier. Wouldn't there be, there's a portion of those proceeds. Even though the checks were not. Issued until January and February. There's a portion of those proceeds that actually relate back to a time of September and October. That your client would not have been entitled to. I understand what the argumentation would be. However, that brings it back to paragraph nine of the MIPA. Because if those particular items have been contemplated to be retained by safe zone by Avery, They would have been included and identified within the paragraph because that literally would say anything that was an obligation by Rivera or anything that would have fallen outside of the actual purview. That paragraph allows for carve outs. That paragraph allows for the actual distinction. Oh, wait a minute. Going back. I think. Justice Hyman or maybe justice Walker already pointed out. Before the divorce, you're calling it a divorce. Mr. Rivera owned 49% of the business. Correct. Even if you were entitled to any money, you'd only be entitled to 49% of it. Because there's nothing here that says he isn't entitled to 49% of it, but there's nothing there that says he is. So going back to the reality that. Mr. Avery and Mr. Rivera each owned shares in safe zone and Mr. Rivera on 49%. The work that was being done until the split was being done by safe zone, a company that was owned by both of them. So. Assuming for a minute that Mr. Rivera is entitled to any money. It would only be 49% of it. That would be correct. If there was not the MIPA. But the MIPA and the assignment are both very are worded in a way that really complicates matters. And I think that the only clear way to read them is to understand that before the split. There was a 51, 49% ownership interest in safe zone. And there's nothing that changes that in the MIPA or in the assignment, the assignment. Okay.   Says Rivera's. Transferring everything. And the MIPA says. Safe zone will have no interest. But. Safe zone had an interest. Before while the work was being done. Under their auspices while they were doing the work. I believe. Let me clarify that. So. At the time prior to the MIPA. Yes. 49 51. That's the distribution between Mr. Rivera and Mr. Avery. For the ownership of season. The MIPA acts as an intervening. Action or intervening state. Or event. You're saying at that point. I don't want my 51% or I don't want my 49%. You can have it. Well, it was basically that. It was 49 and 51. Of the ownership of safe zone. Right. Basically for the potential distribution or anything else. But because the MIPA buys clear lane, which allows for the transfer. Specifically orders that you're transferring. Of the project. From safe zone. Into Rivera. That is it. That's why I'm saying it's an intervening. Action or an intervening event. If it was simply existing without the. Purview or without the actual event. Of the MIPA. Then it would be the 49 51%. The MIPA. Is the actual. The documentation that was entered into by the parties. Oh, again, what you're saying is that this divorce. At the time of the divorce, the 51, 49%. The work that was done by a hundred percent of safe zone. Until this divorce. So, in terms of the MIPA. All goes to Rivera. In terms of the MIPA. Or it all goes to Avery and Rivera doesn't get any of it because. There's there's no. There's no way. I can clarify this because Mr. Jacobson. You are not talking the same language. I understand that Mr. Kelleher and you disagree. As to what's going on here, but it's interesting that you, you. You don't respond to Mr. Kelleher's argument. And I'll tell you what his argument was. Again, it's not. And you keep talking about the MIPA. That was not his argument. His argument today and in the briefs. Is the assignment. And the assignment has a sentence. That. Seems to clarify exactly. What his point is. And work against what you contend because you keep talking about. Paragraph one of the assignment or the MIPA, but sentence two. In the second paragraph. And I'll read it by using the word Rivera. Rather than a sign or because he's defined as a sign. Rivera. Hereby acknowledges. That all amounts that a signer may otherwise be entitled to. From the company. Which we know is safe zone. Have been received. Therefore, no money. Should then go to Rivera. It should 100%. Go to. Safe zone, which is what their position has always been. We did the work. In the assignment provides that he said, I'm not owed anything more. But you say, no, no, no. I'm old for the work that he did. Because of the MIA, but you don't read the assignment. So do you tell me how I'm wrong on that sentence? Mr. Jacobson, you can go ahead. Because I have a question for you really quickly too. And you're almost out of time.  Yeah. That particular provision within the assigner hereby acknowledges all amounts of signer may otherwise be entitled to from the company had been received. That is that the. Safe zone is a complete S. I noted again is a complete divorce. It is not a situation where by Rivera could somehow make a claim for any additional proceeds. That safe zone would be receiving. Any kind of amounts that were specified here in the alleged work was completed prior to the MIPA. And would be contemplated at the time of the parties when they entered into the MIPA and the assignment. Okay. You're not reading the words.  May otherwise be entitled. May otherwise be entitled. Tell me what that means. Isn't this otherwise. If it's secured any other work. Because of it, as is noted. These are three projects. If they are, if it's a situation whereby. There might've been additional projects or anything else. Any other. I'm talking about this one project. This is all amounts. It doesn't differentiate. It says all amounts. May otherwise be entitled to and from the company have been received. That is what Mr. Avery has been saying over and over again. And is very consistent. And at the very least, it seems that there's a, there's a definite ambiguity when you look at the assignment. I disagree. Under the overall amount here. Or specifically saying all amounts that a signer may otherwise be entitled to from the company have been received. The signer forever waves. Any and all rights to claims to the membership interest assets of the company. Or the related interest here in. Okay. I want to get to sort of an important question here because the circuit courts. Reasoning focus largely. Largely on the ownership. Of the project. And I want to know. How were Avery's allegations concerning the open invoices fully resolved in the. In the circuit court. I believe that that was resolved to an extent in the April one, 2024. Order whereby a judgment was entered against Mr. Rivera. And also I believe Mr. Lewis as well. I'm sorry. You can go ahead and close up. You were breaking up. Oh, I'm sorry. Am I breaking up? I was saying you're out of time, but I do want you to go ahead and close out. Okay. Well, basically it's still at the MIPA is clear. This was again, a divorce between the different parties. This was a situation whereby. Rivera was to take his projects and go this way. Safe zone was to take its projects and anything else that it might have and go this way. It was not a situation where they're continued mixing or anything else. And any projects or any considerations that were made at the time. Or made at the time. That's what was available. On the issues of the. Claims against JLL. As far as a default. That stems from a discovery issue. Again, there's abuse of discretionary standard. And then there's the request for the attorney's fees. Where it increased overall from. Again, they were awarded 29,000, 416, 44. I believe on April 1st, 2024. And at one point they were seeking 433,000, 951. And 53 cents in attorney's fees. The court properly use the Kaiser approach. Again, the implementation of attorney's fees. And the fact that these are granting attorneys fees is an abuse of discretionary standard. And it was held by the court that. These amounts were unreasonable. Given the amount that was actually prevailed. And the fact that these attorneys fees were for every single part of this entire case against every party. Thank you. Mr. Webber. I believe actually judge, we had requested that. Mr. Higgins proceed first, but I'm happy to adjust if. If you want Mr. Higgins to receive first go right ahead, Mr. Higgins. Thank you, judge Walker. Good morning, your honors. I'd like to start today by. Addressing and focusing it on the assignment. That seems to be the court's concern here. The language that Mr. Keleher relied upon here reads a signer here by acknowledges that all amounts that as ignore may otherwise be entitled to from the company. Have been received. The dispute here is whether or not checks that were issued by Lynn Mathis. And the project owner. The January and February checked. Were received. The assignment language talks about amounts from the company. These January and February checks are Mount are not amounts due from the company to Mr. Rivera. These were amounts that were due from Lynn Mathis. This particular sentence does not apply because it only applies to things that were due from safe. So, and the amounts in question are not amounts that are due from. Who was your self contract with. It's with safe zone, your honor. Okay. So I don't understand your, it sounds circular to me. It's safe. So safe zone. That's right. It's safe. So it's not Rivera. It's not LL, whatever. It's safe zone. So why didn't you just pay the check? You did. The first check was to safe zone, right? Both checks were payable to safe zone, your honor. Absolutely. Because that was the appropriate person to pay. Wasn't it. We disagree. We agree to disagree. I mean, what, what is your, why are you supporting? I'm trying to understand why, why is it important for you to support. Rivera. I mean, isn't this fight between Rivera? And Avery, what, what, why are you in the middle of this? Does it matter to you? Your honor, we have the exact same thoughts as you. This is a partnership. I'm trying to figure out why you're here. Okay. I'm trying to figure out why you're here. We agree your honor. I mean, if you tell me, I thought you were going to tell me about why you should be. Well, I think that actually, I think that actually answers all the questions. So thank you, Mr. Higgins. We're going to now move on. We're going to move on to the next item on the agenda.  And who's next. Respectfully. Could I have my time? So you can, you can close out. Go ahead. You can close out. I agree with justice Hyman that I think that the position that the three of you are in is just not the same. So you can close out. I appreciate that justice Walker. The two things I would quickly say is. The MIPA, the MIPA. Applies to all rights, titles, and interests in the Emmett project. At the time, the MIPA was executed in November six. There was an outstanding right to payment for work that was previously performed because of the captures all rights, titles, and interests. It must capture the right to payment. That was outstanding at the time of the execution of the MIPA. That does not read the assignment. We've gone over this, right? Is you just talked about the MPA. That's what Mr. Jacobson did. You don't want to talk about what Mr. Kelleher talked about, which is the assignment. And so you tell me what does it mean when the assigner acknowledges that all amounts that a signer may otherwise be entitled to. From. Safety zone have been received. All it doesn't just. You're right. And on November 6th, your honor, those amounts did not include checks that were issued in January and February months after it. No, no, no, no, no, no. Everything's been received. So nothing more would be received. So they wouldn't get those checks afterwards. It's all been received. They got the a hundred dollars. They've received everything. Right. And now there's a divorce. They're separated. And I would point the honor to the first paragraph. It specifically says that this assignment is on account of the membership interest purchase agreement. And that first paragraph that MEPA language is brought in. I hear justice Walker that this is dispute between safe zone. And Rivera. And we respect that. We would just like to point out that there's a lot of evidence of record, including two emails from Mr. Avery as well as deposition testimony in February, right before the February checklist to be issued repeatedly, telling us to pay this to Rivera. So to the extent. And actually we discussed that email earlier, Mr. Higgins. I brought that email up when I was speaking to Mr. Keller. Understood your honor. Well, I'll see the rest of my time. Then I thank you for your attention today. And we appreciate your consideration for the matter. Who's next. Good afternoon, your honors and council may please the court. My name is Ben Weber. I represent Roosevelt Western currency exchange, Inc. One of the appellees as your honors are familiar, Roosevelt Western currency exchange was merely the. The currency exchange that cashed the January check and issue. But in addition to that, the claims made against Roosevelt are specifically, it's one count for aiding and abetting the conversion of that January check as well as. The October city of Highwood check. As your honors are familiar, the trial court ruled or entered summary judgment in favor of Roosevelt, finding it not liable for aiding and abetting the conversion of either check. But very briefly, I would like to emphasize. That certain issues were not raised in this appeal that I think are strongly indicative as to why summary judgment in favor of Roosevelt was proper. The first was that is that plaintiff appellant has not. Asserted any argument. Stating that the trial courts, November order, barring them from offering witness testimony was made an error. Having made no argument about that in their opening brief or in their reply that order or that there, that argument has been waived. So the trial courts order, barring plaintiff from offering any testimony. In support of its claims against Roosevelt. I think lays the ground for the substantive ruling in favor of Roosevelt. Additionally. Plaintiff also does not argue that the trial court aired in entering summary judgment as it pertains to the October city of Highwood check again, even in the reply and nothing today. Plaintiff still has seemingly abandoned that claim. So the summary judgment in favor of Roosevelt as to the October city of Highwood check, I believe should be affirmed. Turning to the January check in issue. Roosevelt's position is somewhat tied. I believe your honors can acknowledge somewhat tied to the ruling. In favor of Rivera as to the conversion count. Aiding and abetting is not a standalone claim. The trial court found that Mr. Rivera under the MIPA. I'm sorry. The trial court found that Mr. Avery pursuant to the terms of the MIPA was not entitled. Was not entitled to the January check. And by Mr. Avery, I include plaintiff safe zone. Because safe zone and Mr. Avery were not entitled to that check. Mr. Rivera was not light was found to be not liable for conversion. And therefore there's no underlying tort that could support. So if we go the other way and we say that there's a issue here, a fact to be tried, then we should reverse on your client. No. No, your honors. That was, that was merely emphasizing the trial court's basis. I would say that. If, if your honors. Affirm the summary judgment in favor of Rivera. So too, should the. So too, should you affirm summary judgment? If we don't affirm on behalf of Rivera. Are you tied to the hip to Rivera? No, we are not judge. And thank you for. Why don't you make that argument? And you only have a second. Actually, you don't need to make that argument. We understand it. You've made it. So we're going to move on. Go right ahead. Yes, sir. May it please the court. My name is Dominic. And I represent the defendant at Peli Belmont bank who respectfully asked this court to affirm the circuit court's grant of summary judgment and Belmont's favor. The past five years of litigation related to the February check could have, and should have been avoided. On July 29th, 2021. We know those things. Belmont pleaded the offense. The affirmative defensive avoidable consequences predicated on safe zones refusal to accept the joint reissuance of the check pre-suit. Safe zone did not answer Belmont banks, affirmative defenses. And on that record, any alleged damages tied to the February check as it relates to Belmont bank were avoidable and summary judgment should be entered in favor of Belmont bank. Under the uniform commercial code. Safe zone fares, no better, your honors safe zone. Sole claim against Belmont was brought pursuant to 404 D of the UCC section D imposes comparative fault consequences only with respect to instruments to which a subsections a or B applies. Accordingly the threshold here as to Belmont bank is threshold. Does the February check fall within a or B. The undisputed record says no. 404 a requires impersonation of identity and not merely acting without authority. Rivera acted in his own name at all times. He was known to the drawer Lynn Mathis throughout the project. Lynn Mathis had a long relationship with JLL and Rivera. The record establishes that. Mr. We agree with you. He was not an imposter. That's what you argue. You argue that really well in your brief. And you're repeating your brief right now. And you've done an excellent job. Thank you. Justice Walker. So in conclusion, the case against Belmont bank turns on threshold requirements of 404. The undisputed record establishes that the February check was intentionally drawn jointly to the jail on safe zone and delivered through a known project contact in Rivera, who at all times acted in his own name. There was no imposter under a no fictitious pay under B because neither a or B apply 404 D is unavailable as a matter of law. For the reasons set forth more fully in the briefs, Belmont respectfully requests that the court affirmed summary judgment in Belmont's favor. Thank you. Okay. Mr. Thank you, justice Walker. I will be very brief. I just want to reiterate the DeNova review and the facts are construed for safe zone.  I believe that this dialogue that your honors have had with, with all the council today confirms why summary judgment is improper. What we're digging into the intent of, of the, the litigants in terms of the contract and, and trying to discern the contractual intent, what was, was the assignment controlling versus the MIPA. These again are fact questions that are improper for, for the drastic remedy of summary judgment. And finally, I would just also echo justice Hyman's point about paragraph two of the assignment. And that whole, that whole paragraph, there's two sentences and counsel for Lynn math is focused only on the first sentence. Both sentences are important. And in the second sentence, it says Rivera waves any and all rights and claims to the membership interest assets of the company or any related interest herein. So based again on that clear language in paragraph two of the assignment again, we assert that summary. And thank you. Thank you all for your excellence and your briefs were all very well done and your arguments today have been well done. Thank you. We appreciate your excellence. Thank you. Thank you, your honor.